

U.S. Department of Justice

United States Attorney
Eastern District of New York

F.#2010R00717

271 Cadman Plaza East
Brooklyn, New York 11201

September 18, 2014

By ECF

The Honorable Sterling Johnson, Jr.
U.S. District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY  11201

      Re:    Maksim Shvedkin v. United States
             Criminal Docket No. 10-347 (SJ)

Dear Judge Johnson:

      On March 10, 2014, the defendant, Maksim Shvedkin, pleaded guilty pursuant to a plea agreement to the sole count of a superseding information, which charged him with conspiring to pay healthcare kickbacks in violation of 18 U.S.C. § 371.  The government respectfully submits this letter in support of its position that the defendant should be given a sentence within the United States Sentencing Guidelines ("the "Guidelines" or "U.S.S.G.") range calculated by the government to be 27 to 33 months – a calculation to which the defendant stipulated as a condition of his plea agreement.  This letter will also respond to certain of the points raised in the letter submitted by the defendant on September 5, 2014.  The defendant's sentencing is currently scheduled for September 23, 2014 at 9:30 a.m.

I.      BACKGROUND

      A.    The Kickback Scheme

      The defendant participated in a conspiracy to pay kickbacks to Medicare beneficiaries in connection with the health care fraud scheme perpetrated at the Solstice Wellness Center ("Solstice") in Rockaway Park, New York.  As detailed in the Revised Presentence Investigation Report dated June 1, 2014 ("PSR"), the defendant was one of several individuals who provided cash compensation to Medicare beneficiaries to present themselves for treatment at Solstice.  (PSR ¶¶ 21-22; 26).  The scheme participants then submitted claims to Medicare for services purportedly provided to the kickback-receiving

beneficiaries that were either not performed or medically unnecessary. (PSR ¶¶ 22-23). The scheme resulted in the submission of claims to Medicare in an amount totaling approximately $3,427,360.90 for the time period January 1, 2009 through April 29, 2010; Medicare paid out approximately $1,489,909.40 in reimbursement of those claims. (PSR ¶ 34).

  B. <u>The Defendant's Involvement in the Scheme</u>

    As discussed in the PSR, the government's investigation of this case involved the use of an undercover beneficiary. The defendant paid cash kickbacks to the defendant on three separate days: March 19, 24, and 31, 2010. (PSR ¶¶ 30-32). The total kickback payment paid to the undercover beneficiary by the defendant was $350 – this payment constituted reimbursement to the undercover beneficiary for seven visits to Solstice at a rate of $50 per visit. (<u>Id.</u>). The defendant also offered to pay additional compensation to the undercover beneficiary in exchange for referrals of additional patients to Solstice. (<u>Id.</u>). The undercover beneficiary received these payments from the defendant in the "kickback room" at Solstice – the same room in which the undercover beneficiary had received cash payments from Aleksey Shteyman before receiving them from the defendant. (<u>Id.</u>). The defendant was actively involved in the conspiracy for at least the time between March and May 2010. (PSR ¶ 34). For that time period, claims for services purportedly provided to Medicare beneficiaries at Solstice totaling approximately $182,000 were submitted to Medicare; Medicare paid out $72,302.04 in reimbursement of those claims.

  C. <u>Prior Conviction and Procedural Background</u>

    The defendant was originally arrested pursuant to an indictment dated April 30, 2010 charging him and three co-defendants with various crimes. On June 21, 2011, the defendant pleaded guilty pursuant to an agreement with the government to one count of a superseding indictment charging him with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. On October 26, 2012, the Court imposed a sentence of five years probation, along with a $25,000 fine, a $100 special assessment, and a $72,302 restitution payment. As part of his plea agreement, the defendant consented to, and the Court ordered, a separate forfeiture payment of $72,302.

    On February 14, 2014, the Court entered an order granting the defendant's motion filed under 28 U.S.C. § 2255 to vacate his conviction on the grounds that his guilty plea had not been entered pursuant to a knowing and voluntary waiver of his rights. (Civil Docket No. 13-6356). Specifically, the Court found that the defendant had not been properly advised of the potential immigration consequences of his plea. (Order at 2). The government did not oppose the defendant's motion. On March 10, 2014, the defendant waived indictment and pleaded guilty before the Court to a one-count superseding

information charging him under 18 U.S.C. § 371 with conspiracy to offer and pay health care kickbacks in violation of 42 U.S.C. § 1320a-7b(b).

## II.     THE ADVISORY GUIDELINE RANGE

The government disagrees with the Guidelines calculation set forth by the Probation Department in the PSR.  Specifically, while the government agrees that U.S.S.G. § 2B4.1 is the appropriate Guideline for determining the advisory range and assigns a base offense level of 8, the government respectfully submits that the $182,000 in claims submitted to Medicare during the time of the defendant's active involvement in the conspiracy should be the measure of the improper benefit to be conferred – not the $72,302 that Medicare actually paid on those claims.  (PSR ¶ 43).  As a result, the government contends that 10 points should be added to the base offense level instead of the 8 points added in the PSR's Guidelines calculation (i.e., improper benefit in excess of $120,000 instead of in excess of $70,000).

The application notes to § 2B4.1 sets forth that the "'value of the improper benefit to be conferred' refers to the value of the action to be taken or effected in return for the bribe."  U.S.S.G. § 2B4.1 cmt. n. 1.  The Guideline itself says that if the value of the improper benefit to be conferred exceeds $5,000, then the base offense level should be increased by the number of levels corresponding to the appropriate value set forth in the table at § 2B1.1.  That table is typically used to calculate loss associated with fraud crimes.  Commentary to § 2B1.1 says that "loss is the greater of actual loss or intended loss."  U.S.S.G. § 2B1.1 cmt. n. 3(A).  Elsewhere the commentary indicates that "[i]n a case involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted."  Id. at cmt. n. 3(F)(viii).

The government's position is that the appropriate measure of the "value of the improper benefit to be conferred" is the amount of claims submitted to Medicare that were tainted by the kickbacks paid by the defendant and his co-conspirators.  See U.S.S.G. § 2B4.1 cmt. background ("If a gambler paid a player $5,000 to shave points in a nationally televised basketball game, the value of the action to the gambler would be the amount that he and his confederates won or stood to gain."  (emphasis added)); United States v. Gonzalez, Nos. 12-15127, 12-15128, 2013 WL 3927776, *5-*6 (11th Cir. July31, 2013) (holding no plain error in district court's application of loss principles under § 2B1.1 to calculate Guidelines range in case in which defendants pleaded guilty to conspiracy to pay healthcare kickbacks and substantive kickback counts); Angarita v. United States, Nos. 09-20015-CIV, 07-20669-CR, 2010 WL 2872821, *20 (S.D. Fla. May 24, 2010) (for purposes of assessing

claim of ineffective assistance of counsel, concluding that that "the amount of the 'intended loss' as determined in § 2B1.1 is the same as the amount of the 'improper benefit' under § 2B4.1."), decision upheld on different grounds by Angarita v. United States, No. 09-20015-CIV, 2010 WL 2872737, *5 (S.D. Fla. July 20, 2010); cf. United States v. Nachamie, 28 Fed. Appx. 13, 35-26 (2d Cir. 2001) (upholding calculation of loss amount as "the entire amount billed to Medicare" where district court found that defendant had knowledge that tests were not medically necessary); United States v. Aginsky, 165 F.3d 15, 15 (2d Cir. 1998) ("[I]t was reasonable for the district court to infer that the whole purpose of Aginsky's initial payment of kickbacks to Medicare beneficiaries was to create artificial demand for All Health's medical devices."). Applying this position to the loss table in § 2B1.1 results in the addition of 10 levels (improper benefit in excess of $120,000) to the base offense level of 8 instead of the 8 levels added by the Probation Department (improper benefit in excess of $70,000).

        The government also contends that a three-level enhancement for an aggravating role under § 3B1.1(b) is appropriate based on the defendant's role in the offense. The government registered the same disagreement with the Guidelines calculation contained in the original PSR prepared in connection with Defendant Shvedkin's prior plea to the crime of conspiracy to commit health care fraud. See Gov't Sentencing Submission dated 10/17/12, docket no. 286. Specifically, the government's position is that Shvedkin was a "manager or supervisor (but not an organizer or leader)" in "criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b).

        The government's evidence indicates that the defendant became the primary point of contact for the beneficiaries who received compensation to present themselves at Solstice and that the defendant personally doled out payments to these beneficiaries from an office located at the clinic. As noted above, the defendant also promised additional payments in exchange for patient referrals to the clinic. The facts described in the PSR establish that paying beneficiaries was a systemic practice at Solstice, with payments methodically calculated based on the number of visits to the clinic and recorded in a ledger. (PSR ¶ 26). Beneficiaries frequently queued up to receive kickback payments from members of the conspiracy, including the defendant, and openly discussed the fact that they were being paid to attend the clinic. (Id. at ¶¶ 25, 27-33). In light of the volume of kickback payments and the defendant's role in the scheme, the three-level aggravating role enhancement is warranted.

        It is important to note in connection with both the calculation of the improper benefit associated with the kickback conspiracy and the aggravating role played by the defendant that the defendant stipulated to the Guidelines calculation contained in his plea agreement with the government. (Plea Tr. at 15:14-19). As outlined in the agreement, the appropriate calculation yields a total offense level of 18: Base Offense Level of 8 (§ 2B4.1),

4

plus a 10-level enhancement for an intended benefit in excess of $120,000 (§ 2B1.1), plus a 3-level enhancement for an aggravating role (§ 3B1.1(b)), minus a 3-level reduction for acceptance of responsibility.  Because the defendant falls within Criminal History Category I, the resulting advisory Guidelines range is 27-33 months.  This is the same Guidelines range calculated by the government with respect to the defendant's prior guilty plea to conspiracy to commit health care fraud.

### III.     A SENTENCE WITHIN THE GUIDELINES RANGE IS APPROPRIATE

Although the crime to which the defendant has pleaded guilty has changed, the defendant's underlying criminal conduct (and Guidelines range) remains the same.  As with the defendant's prior sentencing, the government contends that a sentence within the Guidelines range is appropriate.  If the Court is not inclined to impose a sentence within the Guidelines range, the government respectfully submits that the defendant should not receive a sentence that is more favorable than the one he received previously, given that the facts remain unchanged.

### IV.     THE COURT SHOULD ORDER RESTITUTION

At the plea hearing in this case, the defendant acknowledged through counsel that an order of restitution was warranted given the losses to the Medicare program that he and his co-conspirators caused.  (Plea Tr. at 16:5 – 17:12).  The defendant also through counsel consented to an entry of restitution under 18 U.S.C. § 3663(a)(3) in the amount of $73,302.  Id.  This figure mirrors the amount the defendant agreed to forfeit as proceeds of the criminal offense to him and his co-conspirators.  Counsel for the defendant indicated that he might try to persuade the Court that there was an alternative procedural vehicle – apart from an order of restitution – by which to convey the money to the government.  (Plea Tr. at 16:18 – 17:2).

Notwithstanding this agreement to an order of restitution in an amount of $73,302, the defendant in his submission dated September 5, 2014 tries to persuade the Court either not to enter an order of restitution at all (with no alternative payment mechanism identified) or to enter one with a much lower amount.  The government respectfully submits that the Court should hold the defendant to his agreement and enter an order of restitution in an amount of $73,302.  Alternatively, should the Court impose a term of probation (as it did in connection with the defendant's prior plea), the government submits that restitution should be ordered as a condition of probation under 18 U.S.C. § 3563(a)(2),(b)(2).[1]

---

[1] The government reads the PSR as concluding that restitution is not necessarily mandatory in this case under 18 U.S.C. § 3663A – not that restitution cannot be ordered.  (PSR ¶¶ 92-93).  In this case, another defendant – Sara Kalantarov – also pleaded guilty to a

The facts discussed in the PSR establish that Medicare has suffered a substantial loss as a result of the conduct of the defendant and his co-conspirators. The evidence – including the experience of the undercover beneficiary – demonstrates that the kickbacks paid to the beneficiaries at Solstice were designed to permit the billing of services that were either not provided at all or medically unnecessary. As noted above, the evidence establishes that paying kickbacks to beneficiaries to attend Solstice was a systemic and methodical practice in which the defendant actively participated. The conduct of the defendant should result in a restitution order commensurate with the losses caused to Medicare by that conduct.

The defendant argues that the ratio of billed and paid amounts from the overall time of the conspiracy (January 1, 2009 to April 29, 2010) to the time of the defendant's active participation in the conspiracy (March 2010 to May 2010) suggests that the pace of kickback payments (and therefore the submission of false claims to Medicare) had slowed by the time the defendant began making payments directly to beneficiaries.[2] Even if this is correct, the defendant is still accountable for the loss caused by his conduct and that of his co-conspirators. That the loss might have been occurring at a slower rate during the defendant's active involvement is irrelevant – especially since there is no evidence that the defendant himself took any steps to mitigate the losses or to convince his co-conspirators to abstain from criminal conduct.

The fact that the defendant promised the undercover beneficiary additional payments in exchange for referring other beneficiaries to Solstice belies any suggestion that the defendant was merely "doing a favor" for his friends in making kickback payments. Similarly, the defendant concedes that he was "available to pay kickbacks if patients asked," even if he was not personally responsible for all kickbacks paid during the time of his involvement. The defendant is therefore properly accountable for all kickback payments – and attendant losses – during this period, even if he himself did not make the payments. See

---

violation of 18 U.S.C. § 371 based on a conspiracy to pay kickbacks and was ordered to pay restitution as part of her sentence. (10-CR-347 (SJ), docket no. 327).

[2] Even if this were a viable position, the defendant's analysis is flawed because it assumes that the total timeframe for the conspiracy was January 1, 2010 to April 29, 2010 – and not January 1, 2009 to April 29, 2010. (PSR ¶ 34). When the figures are adjusted, the methodology employed by the defendant indicates that Solstice submitted fraudulent claims to Medicare during the overall time period of the conspiracy at a rate of approximately $7,081 per day, of which Medicare actually paid $3,078 per day. During the time when the defendant was making payments directly to beneficiaries, the rate was approximately $2,983 in fraudulent claims submitted per day with reimbursement on those claims occurring at a rate of $1,180 per day.

generally United States v. Boyd, 222 F.3d 47, 50-51 (2d Cir. 2000) (holding in the context of the Mandatory Victims Restitution Act, that restitution order can include loss caused by defendant as well as reasonably foreseeable losses caused by co-conspirators).

The defendant also argues – without citation to any evidence – that it is unreasonable to assume that all claims submitted to Medicare during the time of the defendant's involvement were tainted by kickback payments and invites the Court to reduce the loss amount by several arbitrary percentages (i.e., 75% and 90%). Contrary to the defendant's contention, the evidence indicates that Solstice was in the business of paying its patients as a matter of routine and therefore all claims submitted during the time period of the conspiracy are appropriately counted in the loss calculation. As noted in the PSR, the undercover beneficiary in this case presented himself to Solstice voluntarily and, upon arriving at the clinic for the first time, was offered a kickback payment for the initial visit and each and every subsequent visit. (PSR ¶ 28). The practice of paying the patients was open and notorious at the clinic where patients were overhead by law enforcement agents discussing the fact that they were paid and how much they were owed for past visits. (Id. ¶ 25). The history of payments to at least 145 beneficiaries was recorded in a ledger that was obtained by law enforcement officers. (Id. ¶ 26). The prolonged history of beneficiary payments coupled with the defendant's knowledge and participation in the practice provides ample support for a restitution order based on the total payments made by Medicare to Solstice during the time of the defendant's involvement in the conspiracy. Cf. 18 U.S.C. 3664(e) ("Any dispute as to the proper amount or type of restitution shall by resolved by the court by the preponderance of the evidence.").

The government does note with respect to restitution that the defendant made payments of approximately $6,090 in connection with the order of restitution entered as part of the defendant's prior sentence. That money was not returned to the defendant after his previous conviction and sentence were vacated and should be credited against any restitution order the Court should impose as part of this sentencing. Given that Medicare payments to Solstice for claims submitted during the time of the defendant's involvement amounted to $72,302, the government respectfully submits that an appropriate order of restitution would be $66,212 (or $72,302 minus $6,090).

V.     CONCLUSION

For the reasons stated above, the Court should impose a sentence within the Guidelines range calculated by the government (to which the defendant stipulated). If the Court is not inclined to sentence the defendant within the Guidelines range, the government respectfully submits that the defendant should not receive a sentence that is more favorable than the one he received previously. The government also respectfully submits that an order

7

of restitution in the amount of $66,212 be entered consistent with the defendant's acknowledgement that he owes this money to the government and consent to pay it.

                                          Respectfully submitted,

                                          LORETTA E. LYNCH
                                          United States Attorney

By:    /s/ F. Turner Buford
           F. Turner Buford
           Trial Attorney
           (718) 254-6483

cc:    Joseph Potashnik, Esq.